**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**NANCY TAWADROS, as Executrix of the Estate of Madleen Nashed and Samir Nashed,**

**Plaintiff,**

**v.** **5:18-cv-1002 (NAM/TWD)**

**ALLSTATE INSURANCE COMPANY,**

**Defendant.**

---

**APPEARANCES:**

Martin A. Lynn
Lynn Law Firm LLP
750 M&T Bank Building
101 South Salina Street, Suite 750
Syracuse, NY 13202
*For Plaintiff*

Daniel C. Fleming
Wong Fleming, P.C.
300 East 42nd Street, 14th Floor
New York, NY 10017
*For Defendant*

**Hon. Norman A. Mordue, Senior United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

This breach of contract action arises out of an insurance coverage dispute between Plaintiff Nancy Tawadros (as Executrix of the Estate of Madleen Nashed and Samir Nashed) and Defendant Allstate Insurance Company over damage to Plaintiff's property, a home in

Liverpool, New York.[1] (Dkt. No. 2). Presently before the Court are Defendant's motion for summary judgment (Dkt. No. 49), and motions to preclude expert witness testimony (Dkt. Nos. 44, 48).

## II. BACKGROUND

### A. Facts[2]

In 2017, Allstate issued a House & Home Policy bearing policy number 000943351324 with an applicable premium period of September 30, 2017 to September 30, 2018 (the "Policy") to Madleen Nashed for the property located at 7 Forester Road, Liverpool, New York (the "Home"). (Dkt. No. 49-4).

In the winter of 2017-2018, Ms. Nashed was in and out of the hospital and a rehab center, and she asked Hany Kamel to check on the Home while it was unoccupied. (Dkt. No. 49-2, ¶ 18). Mr. Kamel stated that he "checked on the home every 4 or 5 days," and he was "not aware of [the] heating method." (*Id.*; *see also* Dkt. No. 49-24, pp. 12, 17). In his visits, Mr. Kamel did not notice any issue with the heat in the house, but he did not specifically check the thermostat; he felt the temperature was "normal." (Dkt. No. 49-24, p. 18). On or about January 11, 2018, when Mr. Kamel checked on the Home, he discovered water coming from a broken pipe coming down from the second floor, to the first floor, all the way to the basement. (*Id.*, pp. 17, 20). Neither Ms. Nashed nor her daughter Ms. Tawadros were home at the time. (Dkt. No. 49-22, p. 31). Ms. Nashed passed away sometime in January 2018. (Dkt. No. 49-22, p. 14).

[1] Defendant removed this action from New York state court on the basis of diversity of citizenship under 28 U.S.C. § 1332. (Dkt. No. 1). It is undisputed that New York law applies.

[2] Unless otherwise indicated, the facts have been drawn, to the extent they are supported in the record, from Defendant's statement of material facts. (Dkt. No. 49-2).

When Mr. Kamel discovered the problem, he notified Thomas Milazzo, who was a neighbor and also Plaintiff's contractor with TPM General Contractors, Inc. ("TPM"), and Ms. Tawadros was also contacted. (Dkt. No. 49-2, ¶ 5). On January 11, 2018, Ms. Tawadros then notified Allstate about damage to the Home due to a burst pipe (the "Loss"). (Dkt. No. 49-5).

On January 11, 2018, Allstate adjuster Jamie Williamson spoke to Mr. Milazzo about the Loss. (Dkt. No. 49-2, ¶ 6). He testified that he responded on the date of Loss and made the following observations:

> Q. All right. Now, you also testified that you checked the thermostat in the house and it said 55?
> A. Yes.
> Q. Did it feel like 55 in that house?
> A. No.
> Q. What did it feel like?
> A. Cold.
> Q. Okay.
> A. I don't know what to tell you.
> Q. Did you need a coat to wear in the house?
> A. Yeah.
> Q. All right. Did you see your breath when you –
> A. Yeah.

(Dkt. No. 49-19, p. 54). Mr. Milazzo further testified that the weather was "[v]ery cold" that day, and it had been cold in the days leading up to the date of Loss. (*Id.*, pp. 20–21). He also saw frost on the interior of the windows of the Home. (*Id.*, p. 22). Mr. Milazzo testified that he assumed the cause of the Loss was a frozen pipe because the weather was so cold, that "it was, like, zero for, like, 66 hours straight," and that he was doing a lot of work on frozen pipe cases because of the weather. (*Id.*, p. 28). Mr. Milazzo testified that when a pipe freezes and bursts, it usually swells up and "there is a split in it." (*Id.*, p. 37). Upon viewing a photograph of the burst pipe at the Home, Mr. Milazzo testified that he had never seen a break like that before

from a frozen pipe. (*Id.*). Mr. Milazzo testified that when he first went to the Home, he saw space heaters plugged in, and the circuit breakers were tripped from the water. (*Id.*, p. 38).

On January 24, 2018, Allstate adjuster Cliff Millikan conducted an inspection of the Home with Jim Cutrone, another TPM contractor present. (Dkt. No. 49-2, ¶ 10). Mr. Millikan's inspection notes state that: the "water line froze and separated at a tee," Ms. Nashed's neighbor (who was also one of the contractors) "stated [that Madleen] had been in the hospital and recently passed away," and Mr. Millikan requested the gas receipts and electric bills for the Home for the months preceding the Loss. (*Id.*). Mr. Cutrone testified that they did a full house inspection on January 24, 2018, and he showed Mr. Millikan "the damages that were caused by the pipe break and discuss[ed] a plan of repair." (Dkt. No. 49-2, ¶ 11).

On January 25, 2018, Mr. Millikan spoke to Ms. Tawadros, who advised that her mother's health had deteriorated and "she had been out of the home . . . since the Holidays"; and "while away, a member of the church was checking on the home." (Dkt. No. 49-2, ¶ 13). Nahed Sorial testified that he checked on the Home every six weeks or so starting September 2017. (Dkt. No. 49-21, pp. 9–10). He never noticed any problems with heat in the home. (*Id.*, p. 11). Before the loss, he was last in the home in December, and he did not notice it being cold, but he kept his coat on. (*Id.*, pp. 13, 26).

At Mr. Millikan's request, on January 26, 2018, Ms. Tawadros sent him the utility bills for the Home from National Grid from January 2017 to January 2018; the bills included gas and electric usage information. (Dkt. No. 49-2, ¶ 15). Mr. Millikan noted that as there was "very low gas usage," per the utility bills, "it would appear that indeed the gas boiler wasn't used as [a] heat source." (Dkt. No. 49-2, ¶ 17). The daily average gas usage in December 2017 was 0.2 Therm, and 0.3 Therm in January 2018. (*Id.*).

Mr. Millikan noted that the utility bills for the Home showed "fairly consistent" electrical usage for the months before the Loss, and after the date of Loss "the usage increased by almost 10 times." (Dkt. No. 49-2, ¶ 22). On February 21, 2018, Mr. Millikan contacted the TPM contractor, Mr. Cutrone, to discuss the electricity usage for January 2018; Mr. Cutrone explained "he had cleaned, dried-out and heated [the Home] with [a] Dayton 220-volt electric heater which would [have] increased [the electrical] usage." (Dkt. No. 49-2, ¶ 23).

Allstate retained the services of an engineer, Dennis Morrissey, P.E. of U.S. Forensic Associates, who issued reports in March and April of 2018. (Dkt. No. 49-2, ¶ 26). Mr. Morrisey ultimately concluded that "reasonable heat" was not maintained at the Home prior to the loss. (*Id.*, ¶ 32). The Court will discuss his opinions in further detail below.

On April 11, 2018, Allstate issued a letter to Plaintiff denying coverage for the damage caused by burst pipes on or about January 11, 2018. (Dkt. No. 49-12, p. 2). In doing so, Allstate cited to the following Policy provision:

> Section I—Your Property
> Losses We Do Not Cover Under Coverages A and B:
>
> D. Under Dwelling Protection-Coverage A and Other Structures Protection-Coverage B of this policy, we do not cover any loss consisting of or caused by one or more of the following excluded events, perils or conditions. Such loss is excluded regardless of whether the excluded event, peril or condition involves isolated or widespread damage, arises from natural, man-made or other forces, or arises as a result of any combination of these forces.
>
> 6. Freezing of:
> a) plumbing, automatic fire protective sprinkler systems, heating or air conditioning systems;
> b) household appliances; or
> c) swimming pools, hot tubs, or spas located within a heated portion of the dwelling, or their filtration and circulation systems located within a heated portion of the dwelling;
>
> or discharge, leakage or overflow from within a), b), or c) above, caused by freezing, while the building structure is vacant, unoccupied or being constructed,

> unless you have used reasonable care to maintain heat in the building structure. If the building structure is not equipped with an automatic fire protective sprinkler system, you may elect to shut off the water supply and drain the water from the systems, appliances, swimming pools, hot tubs, spas and their filtration and circulation systems instead of maintaining heat in the building structure."

(*Id.*, pp. 2–3).

**B. Expert Evidence**

**1. Mr. Morrissey**

Allstate's engineering expert, Mr. Morrissey, reviewed information including the Home dimensions and layout, inspection photographs, weather data, and the National Grid bills for the billing periods of November 24, 2017 to December 22, 2017 and December 22, 2017 to January 24, 2018. Based on this information, Mr. Morrissey opined that "there was no measurable heat provided to the living areas of the [Home] by the natural gas delivered to the [Home] between November 24, 2017 and January 24, 2018." (Dkt. No. 49-11, p. 5). Mr. Morrissey opined that "reasonable heat maintenance within a residential building requires a minimum average interior temperature of 50 degrees Fahrenheit." (*Id.*, p. 4). Mr. Morrissey stated that between November 24, 2017 and January 23, 2018, the average outside air temperature in the area was 24.6 degrees Fahrenheit. (Dkt. No. 49-10, p. 6).

Mr. Morrissey found that between November 24, 2017 and December 22, 2017, "[t]he average daily electrical energy usage at the [Home] . . . was 21.2 kilowatt-hours per day," which "was the amount of energy used by a 1,500 watt portable electric heater" or "approximately the same heat output as a hand-held hair dryer, operated approximately 14 hours per day." (Dkt. No. 49-11, p. 5). He stated that "[a] 1,500-watt heater operated for 14 hours per day could not provide reasonable heat maintenance . . . when the average outside air temperature was 31.2 degrees Fahrenheit." (*Id.*).

Mr. Morrissey concluded that between November 24, 2017 and December 22, 2017, the estimated "average inside temperature of the [Home] . . . was approximately 36 degrees Fahrenheit, which was 14 degrees below the 50 degree[s] Fahrenheit inside temperature that constitutes maintenance of reasonable heat." (Dkt. No. 49-11, p. 5). Mr. Morrissey opined that "reasonable heat was not maintained in the [Home] between November 24, 2017 and December 22, 2017." (*Id.*, p. 4). Mr. Morrissey concluded that "sometime between December 23, 2017 and January 24, 2018 reasonable heat was provided to the building." (*Id.*). He stated that a "reasonable assumption" is that "the inside temperature . . . on or shortly prior to January 11, 2018 was below 32 degrees Fahrenheit (freezing)," and sometime after that date, "reasonable heat was provided to the building, as indicated by the significant increase in electrical energy usage" from December 2017 to January 2018. (*Id.*, pp. 5–6).

On September 6, 2019, Mr. Morrissey issued a third report, wherein he reaffirmed his previous findings and provided the following supplemental opinions:

> B) The National Grid invoices for the property indicated that reasonable heat was maintained in the building throughout the winter of 2015-2016 by the gas-fired boiler and the consumption of natural gas, but that the boiler and natural gas consumption did not maintain reasonable heat in the building during the winter season of 2017-2018.
>
> C) The National Grid invoices indicated that electric consumption during the winter of 2017-2018, when the building was reportedly unoccupied, was not sufficient to provide reasonable heat to the building, but was greater than the electric consumption in 2015-2016, when the building was likely occupied for most of the winter. This information indicated that it was highly probable that electric heaters were used in the building during the winter season of 2017-2018, as previously reported.
>
> D) The physical evidence observed at the property indicated that the separation of the soldered water line joint observed above the ceiling of the front entrance foyer of the building was consistent with damage caused by a frozen water line.

(*Id.*, p. 4).

**2. Mr. LeComte**

Plaintiff engaged Glen L. LeComte, Jr., P.E. of Argus Engineering PLLC, to inspect the Home and determine the cause of the Loss; Mr. LeComte inspected the Home on July 19, 2018 and prepared a report dated August 5, 2019. (Dkt. No. 49-25). Mr. LeComte concluded that "the pipe did not break due to freezing water." (*Id.*, p. 2). Mr. LeComte stated that he reached this conclusion "based on my visual inspection of the pipe which did not show evidence of a pipe freeze." (*Id.*). Mr. LeComte explained that "pipes that freeze due to water normally result in a 'slit' to the pipe wall where water is released," and that the pipe in question did not show signs of a slit, expansion, bulging, or any other indication that ice caused it to break. (*Id.*, p. 3). Mr. LeComte further stated that he has "practiced engineering in the Syracuse area for more than 25 years," is "personally familiar with the construction in this neighborhood," and "well acquainted with the differences between a pipe failure due to freezing and a pipe failure due to a break." (*Id.*).

**3. Rebuttals**

Both experts also reviewed each other's reports and provided rebuttals. Among other things, Mr. Morrisey stated the following:

> The physical evidence observed at the property indicated that the separation of the soldered water line joint observed above the ceiling of the front entrance foyer of the building was consistent with damage caused by a frozen water line. Although there was no evidence of any bulges or longitudinal splits that can occur during a water line freeze, I have encountered numerous separations of soldered water line joints that were attributable solely to water line freezes. The presence of a bulge or a longitudinal split in a water line is not a required condition that necessarily occurs prior to the failure of a water line due to freezing conditions.
>
> The separation of the joint indicated that the soldered joint was the weakest portion of the section of water line that experienced freezing conditions. The separation indicated that the structural capacity of the copper tubing to resist bulging or splitting exceeded the structural capacity of the joint to resist separation. Upon separation of the joint, the pressures in the water line dissipated, returned to normal

> operating levels, and water flowed through the separated joint into the living areas of the residence. The flowing water and open joint prevented continued pressure conditions within the water line that could have caused the copper tubing to bulge or split.
>
> Engineering calculations indicated that the separation of the joint required the application or the introduction of a horizontally oriented force of at least 900 pounds, either an externally applied force, or an internal force that developed as a result of internal pressures within that portion of the water line. There was no evidence that an external force was applied to the water line, such as distorted, abraded, or marred copper tubing. Therefore, the separating force was a result of internal pressures in the water line that significantly exceeded the operating pressures of the water system that serviced the property. The physical evidence observed at the property indicated that the cause of internal pressures that resulted in the joint separation was freezing of the water line in the area of the separated joint.
>
> The Argus Engineering Report concluded that because there was no bulge or longitudinal split in the tubing, the joint separation was not caused by freezing conditions. As indicated above, based upon my experience and the application of engineering principles, the presence of a bulge or longitudinal split is not a pre-condition of a failure of a water line due to freezing. Further, the Argus Engineering Report offered no explanation of a possible cause of the joint separation at the subject property.

(Dkt. No. 49-27, pp. 4–5).

In contrast, Mr. LeComte stated the following in relevant part:

> I performed a computer energy load analysis on the building utilizing the inputs of Mr. Morrissey an interior temperature of 36°F and an outside air temperature of 31.2°F to evaluate the claim Mr. Morrissey makes that a pipe froze in the interior of the residence.
>
> Accordingly, a simulation was performed at the 36°F indoor temperature and 31.2°F outside temperatures established in Mr. Morrissey's report. The results of this energy modeling yielded a heating load of 2,691 Btu/h. The expected output of the 1,500-watt heater described in Mr. Morrissey's report would be approximately 5,100 Btu/h, which exceeds the amount of heat needed at the conditions established by Mr. Morrissey. The broken pipe is located in an interior ceiling several feet from any exterior wall; approximately three 16" wide wood joist cavities away. For water to freeze in a pipe freezing temperatures (at or below 32°F) would need to exist and be present for a sustained period of time. Water does not freeze instantly upon encountering 32°F. Based on the assumptions made by Mr. Morrissey, there is no evidence that the temperature was below freezing in the location of the broken interior pipe. . . . Based on Mr. Morrissey's assumptions,

the temperature in the interior location of the broken pipe could not have reached temperatures low enough to freeze water.

Furthermore, Mr. Morrissey's numerous reports fail to establish the interior temperature of the Nashed residence on any specific day. No evidence or opinion is offered as to what the interior temperature was on January 11, 2018. His reports are based on numerous assumptions and are, at best, an approximation. Using "averages" of temperature creates many problems. It disregards the possibilities of the extremes of high and low temperature being only reached for a short period of time. It is particularly problematic when trying to establish temperature in a concealed cavity of an insulated home that has heat input. There are no direct temperature readings inside the home. Mr. Morrissey's opinion on freezing is based on numerous assumptions, not confirmed data. Even when these assumptions are analyzed the modeling does not support an opinion on freezing in the location of the broken pipe.

I personally inspected the broken pipe in the presence of Mr. Morrissey. Upon inspection of the pipe, there was no evidence of freezing causing the break. There was no bulging, marring or any deformity to the pipe indicting a break caused by a freeze. I would expect to see physical evidence if the pipe had frozen. Mr. Morrissey's report provides no physical evidence that this particular pipe broke because of freezing. For support, Mr. Morrissey provides photographs of other insurance losses of dissimilar pipes, including exterior faucets. No photographs of any other piping at the Nashed residence, including exterior faucets, are included. Based on my long familiarity with this region and this type of construction, I do not see evidence that supports a frozen pipe. I do believe this pipe broke. Mr. Morrissey takes issue with the fact that I am not offering an opinion on the specific mechanism of the cause of the break. However, pipes frequently break without evidence of cause. Here, a pipe failed after more than 50 years of service in the home; this is something that commonly occurs.

Furthermore Mr. Morrissey's assessment does not address the potential of joint failure due to service life issues in hot water piping such as the long-term effects of thermal cycling due to intermittent/infrequent use or exposure to aggressive water chemistry. My experience with residential structures of this vintage (late 1960's construction) has shown that similar soldered copper joints which have been in service for approximately 50 years, as is the case in this installation, have a tendency develop pinholes in the solder over time which ultimately reduces the strength of the joint thus making it more prone to failure.

(Dkt. No. 52-1, pp. 1–3).

## III. MOTIONS TO PRECLUDE EXPERT TESTIMONY

First, Plaintiff moves to preclude in part the testimony of Defendant's expert, Mr. Morrissey. (Dkt. No. 44). Specifically, Plaintiff objects to his opinions that: 1) Plaintiff did not take reasonable care to maintain heat; and 2) that reasonable heat maintenance within a residential building requires a minimum average interior temperature of 50 degrees Fahrenheit. (Dkt. No. 44-5, p. 4). Plaintiff argues that the former opinion should be excluded "because it usurps the role of the jury" on the ultimate issue in the case. (*Id.*, p. 8). Plaintiff argues that the latter opinion "would reinterpret" the Policy and confuse the jury. (*Id.*, p. 9).

Defendant's motion, on the other hand, seeks to exclude entirely Plaintiff's expert, Mr. LeComte, who opined that the pipe did not break due to freezing. (Dkt. No. 48). Defendant argues that Mr. LeComte is not qualified to render an opinion regarding the cause of the Loss, and that his opinion "does not rest on proper factual, legal and/or scientific foundation and lacks the requisite personal knowledge to be reliable here." (Dkt. No. 48-10, p. 4).

### A. Relevant Law

With respect to expert testimony, the Court is charged with a "gatekeeping" obligation under Rule 702 of the Federal Rules of Evidence: the trial judge must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 580 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the

subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). "Under *Daubert*, factors relevant to determining reliability include the theory's testability, the extent to which it has been subjected to peer review and publication, the extent to which a technique is subject to standards controlling the technique's operation, the known or potential rate of error, and the degree of acceptance with the relevant scientific community." *Restivo v. Hessemann*, 846 F.3d 547, 575 (2d Cir. 2017). The reliability inquiry is "a flexible one," *Daubert*, 509 U.S. at 594, and the factors to be considered "depend[] upon the particular circumstances of the particular case at issue," *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).

**B. Analysis**

After careful review, the Court will preclude Mr. Morrissey's opinion that Plaintiff did not take reasonable care to maintain heat. Although Defendant is correct that expert testimony that embraces an ultimate issue is not categorically prohibited, *see* Fed. R. Evid. 704(a), the testimony must be specialized in nature and useful to the trier of fact. Here, the jury will be asked to decide whether Plaintiff's loss is covered by the Policy, which turns on whether reasonable care was used to maintain heat. The Policy itself does not define "reasonable care," and thus the term must be given its plain and ordinary meaning. *See Selective Ins. Co. of Am. v. Cty. of Rensselaer*, 26 N.Y.3d 649, 655–56 (2016). Ultimately, members of a jury in upstate New York are familiar with heating their homes in wintertime, and they can evaluate the totality of the evidence in deciding whether Plaintiff used reasonable care to maintain heat.

Accordingly, Plaintiff's motion to preclude Mr. Morrissey's opinion on this issue is granted. *See Fiataruolo v. United States*, 8 F.3d 930, 941 (2d Cir. 1993) (recognizing that courts should guard against "the admission of opinions which would merely tell the jury what result to

reach") (quoting advisory committee notes to Fed. R. Evid. 704); *Zollinger v. Owens-Brockway Glass Container, Inc.*, 233 F. Supp. 2d 349, 354 (N.D.N.Y. 2002) ("Plaintiffs are correct that expert testimony is not needed on the ultimate issue of whether Hopkins operated his forklift in a safe and prudent manner. The trier of fact is perfectly capable of evaluating the totality of the evidence in this regard . . . and determining whether Mr. Hopkins was operating the forklift in a safe and prudent manner.").

The Court will permit Mr. Morrissey to testify that reasonable heat maintenance within a residential building requires a minimum average interior temperature of 50 degrees Fahrenheit. This is Mr. Morrissey's opinion and thus does not "reinterpret" the Policy. He will have to explain how this specific temperature relates to the potential freezing of pipes. Further, any potential confusion can be cured by a limiting instruction. And Plaintiff can cross-examine Mr. Morrissey to challenge his opinion. *See Amorgianos v. Natl. R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (recognizing "that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony").

As to Mr. LeComte, Defendant argues that he is not qualified to give expert testimony on the cause of the pipe burst, pointing out that he has limited experience with water loss claims, especially compared to Mr. Morrissey. (Dkt. No. 48-10, p. 16). However, Mr. LeComte is a licensed professional engineer with decades of experience in building systems. (Dkt. No. 49-25, p. 3). Mr. LeComte states that he is personally familiar with the construction in the relevant neighborhood and "well acquainted with the differences between a pipe failure due to freezing and a pipe failure due to a break." (*Id.*). The fact that Mr. LeComte does not specialize in water loss claims is hardly dispositive. The requirement for an expert witness is that he must have superior knowledge, education, experience, or skill with regard to the subject matter of the

proffered testimony. Fed. R. Evid. 702. In light of Mr. LeComte's qualifications, it is clear that he possesses the requisite knowledge to support his expert opinion. Defendant's arguments as to Mr. LeComte's qualifications do not support precluding his opinions entirely, but rather go to the weight a factfinder might give them. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) ("Fuller's quibble with Woolley's academic training in fume dispersal and air quality studies, and his other alleged shortcomings (lack of knowledge regarding the chemical constituents of the fumes or the glue vapor's concentration level), were properly explored on cross-examination and went to his testimony's weight and credibility—not its admissibility."); *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 236 (E.D.N.Y. 2014) ("Thus, a witness' lack of particular knowledge, education, or experience may go to the weight, not the admissibility, of the testimony.").

Next, Defendant argues that Mr. LeComte's testimony, particularly his opinion that the subject pipe did not burst due to freezing, should be precluded as unreliable and speculative. (Dkt. No. 48-10, p. 18). However, the Court finds that Mr. LeComte's testimony is sufficiently reliable because it is supported by first-hand inspection, computer modeling, and decades of experience in building systems. (*See* Dkt. No. 48-7; Dkt. No. 52-1). Having carefully reviewed Mr. LeComte's qualifications, reports, opinions, and deposition testimony, the Court finds that his opinions are non-speculative and contain sufficient indicia of reliability. Defendant's arguments to the contrary are better suited for cross-examination. Thus, Defendant's motion to preclude Mr. LeComte is denied.

## IV. MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the

movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

**B. Analysis**

Defendant seeks summary judgment on Plaintiff's claims based on the Policy's exclusion for freezing of plumbing due to lack of heat. (Dkt. No. 49-1, p. 9). Defendant contends that the undisputed facts show that the water lines of the Home were not properly drained, and the heat was not properly maintained to prevent freezing, which caused the pipe to freeze and burst. (*Id.*). Plaintiff opposes Defendant's motion and contends that there are triable issues of fact, including whether reasonable care was used to maintain heat and whether the pipe burst due to freezing or some other cause. (Dkt. No. 52-2, pp. 11–16).

The Court finds that conflicting evidence in the record precludes summary judgment. First, although there is evidence from utility bills that suggest reasonable heat was not maintained at the Home during January 2018, neither person checking on the Home during that period noticed any issue with the heat.[3] (*See* Dkt. No. 49-24, p. 18; Dkt. No. 49-21, pp. 9–10).

---

[3] It should also be noted that the National Grid utility bill for the period between December 23, 2017 and January 24, 2018 shows a substantial increase in electrical usage, which could possibly include heating the Home on the date of the Loss on January 11, 2018. (Dkt. No. 49-8, pp. 51–54).

Second, although Mr. Morrissey concluded that the pipe in the Home burst due to lack of heat and freezing, Plaintiff's expert Mr. LeComte reached the opposite conclusion. As discussed above, Mr. LeComte's opinion is not subject to exclusion, and therefore creates an issue of fact as to causation. In sum, viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find that Plaintiff's loss was covered because the subject pipe did not freeze due to lack of reasonable heat. Therefore, Defendant's motion for summary judgment must be denied.[4] *See Monell v. Scooter Store, Ltd.*, 895 F. Supp. 2d 398, 412 (N.D.N.Y. 2012) (noting that "conflicting expert testimony . . . creates questions of fact and credibility determinations to be answered by the jury"); *Billitier v. Merrimack Mut. Fire Ins. Co.*, 777 F. Supp. 2d 488, 491 (W.D.N.Y. 2011) ("Here, I find that summary judgment would be inappropriate, because resolution of whether Billitier used 'reasonable care' under the circumstances presented and within the meaning of the Policy exclusion *does* depend on triable issues of fact. It would be inappropriate for the Court, on this record, to rule as a matter of law that plaintiff failed to exercise reasonable care to maintain heat at the Property.").

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 49) is **DENIED**; and it is further

**ORDERED** that Plaintiff's motion to preclude certain opinions of Defendant's expert (Dkt. No. 44) is **GRANTED in part and DENIED in part**, as set forth above; and it is further

---

[4] The parties also dispute whether the Home was vacant or unoccupied at the time of the Loss in this case. (Dkt. No. 52-2, p. 16; Dkt. No. 53, p. 5). The Court agrees with Defendant that the undisputed facts show that no residents were living in the Home in January 2018. However, this finding is not dispositive because the Policy still provided coverage assuming that Plaintiff used reasonable care to maintain heat in the Home. (Dkt. No. 49-12, pp. 2–3).

**ORDERED** that Defendant's motion to preclude Plaintiff's expert (Dkt. No. 48) is **DENIED.**

**IT IS SO ORDERED**.

Dated: July 1, 2020
Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge